Mr. Garre, welcome back. Thank you, Your Honor, and may it please the Court. The question in this case is when does a trained drug detection dog's alert to a vehicle establish probable cause to search the vehicle? Are you for or against the dog this time? For it again, Your Honor. For it. The Florida Supreme Court answered that question by erecting what we think is an extraordinary set of evidentiary requirements that, in effect, puts the dog on trial in any suppression hearing in which a defendant chooses to challenge the reliability of the dog. I think most fundamentally the problem with the Court of Appeals, the Supreme Court's decision, is that it misconceives what this Court's cases conceive of the probable cause requirement. Converting probable cause, which this Court has referred to as a substantial chance or fair probability of the detection of contraband or evidence of a contraband crime, into what amounts to a continuously updated batting average and a requirement that dogs be virtually infallible. That's the part that goes to the field performance, but the other requirements that the some showing that the test, that the training program is reputable, some showing that the handler, not only the dog, has had training. It seems to me that those two are not – there's nothing improper about that. Well, I think, Your Honor, under our view of it, it's okay to inquire into whether or not the dog has successfully completed a bona fide training program, which we think is a training program in which the dog is going to be tested for proficiency, including in a setting where some vehicles have drugs and some vehicles don't. And although the dog in this case clearly was, he'd received a 120-hour training program with the police department of Hopka, Florida. He received a 40-hour refresher seminar by another police department in Dothan, Alabama. And he was subjected to continuous weekly training in which part of that training consisted of taking him out, walking him by some vehicles that contained cars, some vehicles that didn't. And the testimony of Officer Wheatley was that all of his performance was really good. And what he meant by that was that if there were eight cars with drugs … Then why didn't they get the dog recertified? By the time of this search, the certification had expired 16 months. It was a lapse, Your Honor. The dog subsequently was recertified. Our position is that the Fourth Amendment doesn't impose an annual certification requirement. Some States have it, some States don't. I think more important in this case was the fact that the dog was continuously trained, continuously evaluated and trained. And what do you have to show to establish that the dog was well-trained? Well, Your Honor, I think the most important thing is successful completion of proficiency testing. I mean, what our friends would like and what the Florida Supreme Court would like would really for the courts to delve into all aspects of the training, what types of distractors were used, what type of smell and printing was used. Well, if it were just that you have to show that the program was reputable. Well, it's certainly that it was authentic, Your Honor. And here that the programs were conducted by actual police departments in Alabama and Florida, and this Court ordinarily would pursue regularity in those sorts of training settings, and there's no reason to approach the training of a dog. Sotomayor, I thought all of these training facilities were private entities that contracted with police departments. No, Your Honor. Certification. Certification usually is done by private entities which are operated by former law enforcement officers. But the training itself, it usually in here was done by police departments themselves. Could I go back to Justice Ginsburg's question? There's no ‑‑ what I read the Florida court saying is there's no national standard for certification. That's correct? Yes. There's no national standard that defines what's adequate training, correct? That's right. There are ‑‑ So let me just finish my question.  How do you expect a judge, without asking questions about the content of the certification process, the content of the training process, and what the results were and how they were measured, how do you expect a judge to decide whether the certification and the training are sufficiently adequate? And I think that the central inquiry that we would think the judge would undertake is to determine whether or not the dog was performing successfully in proficiency testing. And after all, that's why we train the dogs. But you still have to ask what that training was, and the judge still has to determine whether the judge believes it was adequate, correct? That's what the totality of circumstances requires. Well, Your Honor, in our view, we don't think it's an appropriate role for the court to delve into the contours of the training, what specific methods were used to train or distract or, you know, all the contours of the training. So what does the judge do? Just say the police department says this is adequate, so I have to accept it's adequate? Not that you would have to accept it, Your Honor, on its face. I think you ‑‑ in a record like this, and I think this record is clearly sufficient, and ultimately that's what we're asking this Court to hold. What you have in the record is evidence ‑‑ Sotomayor, I have no problem that this record ‑‑ with this record. My problem is how do we rule, because it seems to me that I'm not quite understanding what ‑‑ how the legal rule you're asking us to announce. I think the legal rule you're saying, if the dog has been tested for proficiency by a police department's determination of what's adequate for proficiency, that establishes probable cause. That's what I think the rule you want us to do. I don't know what the role of the judge is in that ‑‑ I think it would be close to that. We would ask whether or not the dog successfully treated, completed training by a bona fide organization. No certification, no questioning of the handler and the handler's training? The judge can't do any of that and shouldn't do any of that. Certification is not required. It may be one way that the police department could establish reliability, a different way, but certification itself is not required when you have a record of the type of training that you have here. We do think that you could put the handler on the stand and ask about the reliability, certain questions about reliability. We don't think on a record like this the judge would say, well, it says that he completed 128 hours in narcotics detection at the Apopka, Florida, police department and 40 hours with the Dothan police department. So it's not enough for you to win by us saying that a court can't insist on performance in the field records, that it has to look at the totality of the circumstances. What other case have we announced under a totality of the circumstance test, a absolute flat rule like the one you're proposing? Where else have we said that one thing alone establishes probable cause? That one factor alone? Your Honor, I think one area where the Court mentioned that was in the Lago Vista case where it talked about the importance of clear rules for police officers and trust. I suppose that if the reasonableness of a search depended upon some evidence given by a medical doctor, the Court would not go back and examine how well that doctor was trained at Harvard Medical School and what classes he took and so forth, right? Absolutely. In the same way that when an officer provides evidence for a search warrant, we don't demand the training of the officer or what schools he went to or what specific courses he had in probable cause. But, Mr. Garre, you said there was the certification training program, but you gave a third, you said, or otherwise show proficiency in locating narcotics. So if there's no certification, no training, how would the State establish that the dog was reliable in detecting drugs? Your Honor, I think that that would be the unusual case, and it probably would be captured by the other factors. But what we meant by including that is that there's no limit on the types of evidence that the police could submit to show reliability. If you didn't have certification or a formal training program, the fact that there was evidence that a dog like Aldo successfully performed weekly training over the course of a year and the police submitted the records like the records in the joint appendix in this case at pages 106 and 116, that might be another way of establishing reliability. But the central way would be showing that the dog successfully completed training or that the dog was certified. Ginsburg. And I think you agree that the handler, too, the handler would have to. Well, Your Honor, we don't think there's a Fourth Amendment requirement of certification for handlers. Again, this is something that varies among States. Not certification, but that the handler has been trained to work with drug detection. Yes. That's correct. And Officer Wheatley here, of course, had been trained. He had gotten a 160-hour course in narcotics detection. And had done training with Aldo in the Dothan, Alabama, Police Department, 40 hours there. And these dogs, the dog Aldo and Officer Wheatley had worked together for about a year before the time of the search. The handler themselves are going to be in the best position to know the dogs and evaluate the reliability. And they have a strong incentive to ensure that dogs are reliable. That's both because they don't want to miss contraband when it's available, when it exists in the field. And also, they don't want to be put into harm's way. The traffic stop, in particular, is one of the most dangerous encounters police officers face. They're not going to want to be working with a dog that is consistently putting the officer in a position of searching cars based on alert when that dog is not reliable in predicting the presence. Sotomayor, I'm somewhat troubled by all of the studies that have been presented to the Court, particularly the Australian one, where under a controlled setting, one dog alerted correctly only 12 percent of the time. How and when and who determines when a dog's reliability in alerting has reached a critical failure number, and what is — what do you suggest that number is, and how does a judge determine that that's being monitored? We don't think the Fourth Amendment puts a number on it. This Court has rejected a numerical conception of probable cause. But with respect to this case of the South Wales study, which I think is the one that you were referring to, and that's the primary one relied on the other side, in that case, they reported that over the course of several years, the dogs that were alerted  the dogs that were not alerted in the South Wales study, the dogs that were not alerted in the South Wales study, the dogs that were alerted in the South Wales study,  in the South Wales study resulted in discovery of drugs only 26 percent of the time. But there's another part of that study which doesn't come up in the amicus briefs, and that's that in 60 percent of the other cases, the individuals admitted to using drugs or being in the proximity of drugs. And if you include that in the universe of accurate alerts, as you should, then the number becomes 70 percent of dogs accurately alerting. That's 70 percent based on the primary study that they rely upon. Sotomayor, that doesn't answer what happens to the dogs who have – dogs grow old. They're taken out of service for a reason. So how – how is a court supposed to monitor whether or not a dog has fallen out of? Well, primarily by looking at whether the dog is successfully completing training. And you're right, dogs do go out of service when they reach a certain age. Dogs like humans become old and impaired over time. But looking at weekly training records like are available in this case, dogs that successfully perform week-in and week-out in training are going to successfully perform in the real world. And after all, I think the most problematic aspect of the challenges to the reliability of these dogs is that law enforcement agencies across the country at the State and Federal level, law enforcement agencies around the world, and law enforcement agencies that protect this Court rely on detection dogs as reliable predictors of the evidence of contraband, evidence of the presence of explosives, or likewise. And this is an area where we think that a page of logic and experience is worth a volume – a page of experience and history is worth a volume of logic. These dogs have been used and are being used in many settings across the country and across the world today, and the reason they're being used is because the people who work with them know that they're reliable and know by experience that they're reliable. And that's one of the central problems we have with the argument on the other side, is that ultimately this Court should distrust the reliability of the dogs. And again, if you could go back to the other side of the argument, I think it's a good example of a case where the government comes in, says this dog has been through training and the handler has been through training, and this is a case in which – this is never going to come up when the dog actually alerts to narcotics. It's not worth anybody's time at that point. It's only going to come up in a case like this, where a dog alerts to narcotics, there is no – there are no narcotics, but something else is found, and so the person ends up being criminally prosecuted. So it's, you know, a small universe of cases. So the government comes in and says the dog's been trained. Can the criminal defendant at that point call the handler, say how has the dog been trained, what are the methods that the dog has – was used, and how did the dog do in training? Can the defendant do that? Your Honor, I think that the defendant can call the handler and can ask those sorts of questions. I think the Court would cut it off if you got into questions like, well, did they use the play reward or the scent imprinting method in training? Well, what specifics? Because I think that delves too far into the details. Kagan. But you can ask questions like how did the Court do in training? Yes. And that was done here. And how about if you really – if there were some articles that said, you know, that there was a certain kind of method that, for example, led to a lot of subconscious cueing by the handler. Could the criminal defendant say, did you use that method that leads to these problematic results? I don't think so, Your Honor. First of all, cueing is not part of this case because they haven't argued that the dog was cued. The argument is the dog was just sort of inherently reliable. I'm using cueing not in terms of any intentionality, but one thing that I learned in reading all of this was that one difficulty here is that dogs respond to subconscious  cues. And in our position is, is that you can inquire into cueing during this hearing, that the defendants can argue that the dog was cued. And in the course of that argument, you might be able to get into those sorts of things. That's different than the challenge that was made here. There wasn't a cueing challenge made in this case. I would like just to go back to one of the premises of your question, which is that the dog in this case didn't accurately alert. The dog in this case accurately alerted to the odor of illegal narcotics. Kagan. I just meant to say that there were no drugs found. Right. And I think that's another central problem with the Florida Supreme Court's decision is this notion that alerts to so-called residual odors aren't indicative of the dog's reliability. A dog's alert to the lingering odor of methamphetamine, which was in the car, it must have been in the car in this case, is just as accurate as a dog's alert to the presence of methamphetamine itself in the car. If I could reserve the remainder of my time for rebuttal. Thank you, counsel. Thank you. Mr. Palmore. Mr. Chief Justice, and may it please the Court. This Court has long recognized the ability of trained dogs to reliably detect target odors, and such dogs every day perform critical life-and-death homeland security and long-term safety. Counsel, I have two separate questions for you, tying the earlier case a little bit to this one. I'm assuming that your position is, and you'll tell me what the legal standard is, that a well-trained dog, if he alerts or walks by a row of apartments or a row of houses and alerts to drugs, that that simple alert is probable cause for the police to get a search warrant. Yes. We believe that an alert by a trained dog is sufficient to establish probable cause. So that without any other information about, unlike the earlier case or this one where the police officer saw the individual being nervous, et cetera, et cetera, that all of the – all it takes is a dog alert, despite the fact that there is no study that says that dogs reliably alert 100 percent of the time. 100 percent of the time is, of course, not required for probable cause. No, I understand. It's a fair probability standard. Uncertainty is not required. And I think that was the principal and fundamental flaw of the Florida Supreme Court. It demanded infallibility where infallibility is not required. In terms of studies, it is actually well studied. So shouldn't we be addressing the question whether an alert, especially outside a home in particular, should be standing by itself enough? I think what the Court – of course, reliability is important. The question is how you determine reliability. This is a somewhat unique setting where the law enforcement tool is actually tested initially and on an ongoing basis in a controlled setting to establish its reliability. Your Honor asked what the standard for bona fide training is. We think the important point is the outcome of the training. Is the dog proficient? Can the dog reliably detect narcotics odor and only narcotics odor in a controlled setting where false positives and false negatives can accurately be measured? That record is established here. Well, only because the officer said that he satisfactorily performed. And what the Florida court said, but we don't know what that means. Well, I think we do know what it means, Your Honor. There are two different showings that are made here. There is a formal training and formal certification, both for the dog and the handler, separately, and then a separate training, formal training together. But then, just as important, you have ongoing but less formal proficiency exercises conducted by the handler in which the dog, in a controlled setting where errors could reliably be identified, performed quite strongly, including two days before the arrest here. So that's JA113. On June 22nd, the dog performed perfectly in a controlled setting. And we have their records in this case going back several months before the arrest and several months after the arrest showing that this dog passed the test, this dog was reliable. And you agree that that's an appropriate area of inquiry? We think it is. The judge presented, well, here's Aldo, he went to this school, he was certified. The judge can say, well, when was he last tested, right? When did he last go through some? Yes, I think the judge can ask those kinds of questions. The only thing, really, you say they can't ask about is what's his record? Well, there's a question that there's a couple of sub-issues here. The principal vice of the Florida Supreme Court was in imposing an unprecedented and inflexible set of evidentiary obligations that are part of the government's affirmative case that the government has to always introduce any time it seeks to establish probable cause based on a dog alert.  The question of what the government, what are fair game questions for a defendant to ask once the handler is on the stand is a different question. And I think that's what the judge has to ask. Kennedy, in his case, was asked, was the tip reliable, there are any number of permutations. It's a question of whether or not the trial judge was made of correct determination and determining that there was or was not a sufficient cause for the police to proceed. It just happens every day. I think that's right, Your Honor, but I think the critical aspect of reliability in this context is the dog's performance in a controlled setting. Mr. Palmore, you criticize the Florida Supreme Court for requiring evidence of field performance, and assuming that that evidence is not required, if the defendant in preparing for the suppression motion wants what information there is, would it be proper to seek for the defendant, would it be permissible for the defendant to speak to seek through discovery whatever field performance records there are? We don't think so, certainly not as a routine basis. The kind of burden that that might impose on law enforcement we don't think is justified. That's a separate question from whether the defendant can ask the handler, if the handler is on the stand, about field performance, and then the court can give that answer whatever way it is appropriate. We think typically an answer on field abhorrence is not going to be material, it's not going to be helpful. Because the problem is in the field, when a dog alerts, the dog is trained to alert to the odor of drugs. It's like what the Florida Supreme Court wanted, a batting average. A batting average that would be calculated when we know the number of at-bats, but we don't know in many cases whether there was a hit or an out. So we had a fraction where we know the denominator but not the numerator. The answer to the Florida Supreme Court's question and concern about reliability, again, is to go back to the controlled setting, where we know what's a hit and what's a batting average. That needs to be where the focus should be in determining the reliability of a dog. And there should be no reason to constitutionalize the process or the training methodologies that get you to that point. What matters is, is this dog successful in a setting in which we can measure success? And I think that it's also important to point out that the Florida court was basically alone in establishing these unprecedented and inflexible sets of evidentiary requirements. There's a large body of case law in the lower courts on the reliability of drug-detection dogs going back 30 or 40 years. And there are no other courts, no other appellate courts, to be sure, that have imposed these kinds of requirements on law enforcement when it seeks to establish probable cause for a detection for a — after a detection dog alerts. Kagan. And if you take out the Florida Supreme Court in this one trial court in Massachusetts, basically you think what courts have been doing is the right thing? In general, there's some diversity across the courts, but I think that if you look at the — Judge Gorsuch's opinion in the Ludwig case from the Tenth Circuit or the Jones case from the Virginia Supreme Court, you see approaches that are basically sound, where courts have confidence that if law enforcement comes in and says, this dog is trained and has demonstrated proficiency in a training setting, that that dog is generally reliable. And I think as Mr. Garre— But where at the same time they'll allow a defendant to question the handler about that training, about how the dog has performed in that training. Is that right? Yes. Those questions can be asked. But I think it's critical, as Mr. Garre pointed out, that the courts not constitutionalize dog training methodologies or hold mini-trials with expert witnesses on what makes for a successful dog training program. Because as Mr. Garre said, the government has critical interests, life and death interests that it stakes on the reliability of these dogs. So the U.S. Marshals use dogs to protect Federal judges. The Federal Protective Services use dogs to keep bombs out of Federal buildings. The TSA uses dogs to keep bombs off of airplanes. FEMA uses dogs to find survivors after hurricanes. There are 32 canine teams in the field right now in New York and New Jersey looking for survivors of Hurricane Sandy. So in situation after situation, the government has in a sense put its money where its mouth is, and it believes at an institutional level that these dogs are quite reliable. And I think the courts need to understand that. I'm not sure it's relevant, but do dogs, are there, does their ability, is it even across the board? In other words, if you have a dog that's trained and good at stimping out heroin, the same dog is going to be good at detecting a bomb, or is there some difference? No. Well, I think any dog could be trained in either discipline. And if you look at the Scientific Working Group on Detection Dogs report that we cite in our brief, the report explains that the same general methodologies and the same different, same general approach is used to train each kinds of dogs, but typically a drug detection dog will not be cross-trained on explosives. But I'm, so you don't know whether they're, in other words, are dogs good at sniffing things, or are they, can they be good at bombs but not good at meth? Well, I don't know the specific answer to that. But I think once a dog kind of chooses a major, that's what they stick with. But I think the important point is that the dog. You don't want coon dogs chasing squirrels. Right. But I think the important point is these dogs have to meet, have to pass proficiency in an initial training program, and then they, as is shown in the record here in great detail, they show proficiency on an ongoing basis, including, in this case, two days before the arrest. Thank you, Your Honor. Thank you, counsel. Mr. Gifford. Mr. Chief Justice, and may it please the Court. There is no canine exception to the totality of the circumstances test for probable cause to conduct a warrantless search. If that is true, as it must be, any fact that bears on a dog's reliability as a detector of the presence of drugs comes within the purview of the courts. This can encompass evidence of initial training, certification, maintenance training, and performance in the field. Do you understand the government to disagree with that general position? In other words, the trial court, if you have an attorney that's really concerned about the training of this dog, they can ask about it. I do understand the government to disagree about the relevance of field performance. And where I specifically think the government disagrees is on the level of detail that can be inquired into by the trial court on any of these elements. I didn't think they disagreed about what he may do. I thought he disagreed about what he must do. That is, the Florida Supreme Court said you must, da, da, da, da. They have a whole list. I thought that's what the case was about. Well, the Florida Supreme Court did have several passages in its opinion where it talked about what the State must produce. And at first glance that looks rather didactic. However, what I think the Florida Supreme Court was saying there was that if this these records exist, the State must produce them. And that is consistent with the State's burden of proof to justify a warrant of search. Breyer. That's a totally different matter. Of course, I agree with you that a trial judge, he has control of the trial, he's likely to know what's relevant. In different circumstances, different matters will be, and he has first say on what you're going to go into. It's the must. And now you're on the point. Why is that the right list? I mean, what in the Constitution requires that list? I don't believe the Constitution requires it, and I don't believe it. Didn't the Supreme Court believe the Constitution required it? No. I don't think so, even though they used the word must. I think that the must concerns performance records and training records that exist. Farther down in the opinion, the Court says reasons why the State should keep and present performance records. If the State doesn't keep any performance records, then there will be no field performance to show, but that doesn't mean the State loses. Is that what you're saying? The State doesn't keep performance records. The Florida Supreme Court seemed to say field performance records are required. If the State does not keep field performance records, that is a fact, that is a lack of evidence that can be held against the State in the suppression hearing. And it shifts the focus on to providing evidence of the initial training, the certification, and the maintenance training that can show to the trial court that this is a reliable dog. Scalia I thought the Court said held against the State. I thought what the Florida court was saying is if you didn't produce it, the dog's evidence would not be allowed. It's the search is invalid. The Court did use the word must, but it's not a specific recipe that can't be deviated from, because in addition to listing the records that must be produced, the Florida Supreme Court also said, and all other evidence that bears on the reliability of the dog. So it's not a specific recipe, and it's talking about what, if these records exist, they must be produced. Ginsburg But you're saying that the Florida Supreme Court, at least with respect to the field performance records, was wrong, that they — it is not a Fourth Amendment requirement. I don't think they — I don't think they require field performance records to establish them. Ginsburg They said it was part — they outlined what the government must prove, and that was one of them. They said what the government must produce if those records exist. But when you go down to the part of the opinion where the Court applies the law to the facts, the Court didn't just say, because there were no field performance records, no probable cause, we close up shop, conviction reversed. What the Court did was take into consideration the lack of field performance records, the lack of any records about initial training and certification, aside from the fact that this dog had a certificate. And we have to remember that this certificate not only was at 16 months out of date, it wasn't a certificate for Aldo. It was a certificate for Aldo and a Seminole County deputy together as a team. This dog was never certified as part of a team with Officer Wheatley in this case. And the certifications in this area are team certifications, not individual certificates. Scalia Is that a requirement, too, that's a constitutional requirement, that the dog training doesn't count unless it's training with the officer who was using the dog? Now, but that's an indicator of reliability, which is the ultimate test here. Has this team certified as a team? Scalia Well, fine, counsel can bring that up. Counsel can bring that up at the hearing before the judge. But I understood this to be a requirement. You never even get to that hearing because there's no evidence that this dog was ever trained with this placement. That's correct. There is no such evidence. Scalia Yes, and therefore, end of case, right? Now, not end of case. The fact that the dog wasn't trained with this policeman means that you need to look for other evidence of reliability, which also doesn't exist in this case. Ginsburg Well, doesn't this officer has been working with this dog for many months? They have training periods every week. So why isn't that enough to show that this handler and this dog work effectively as a team? Well, first, this weekly training is maintenance training. It's to maintain the dog at a level of proficiency that has previously been established. That level of proficiency hadn't been established with this team of Wheatley and Aldo. The level of proficiency that had been established was with Wheatley and with another Seminole County deputy. Scalia What are the incentives here? Why would a police department want to use an incompetent dog? Is that any more likely than that a medical school would want to certify an incompetent doctor? What incentive is there for a police department? The incentive is to acquire probable cause to search when it wouldn't otherwise be available. Scalia Oh, and that's a good thing. I mean, you acquire probable cause, you go in, and there's nothing there. You've wasted the time of your police officers. You've wasted a lot of time. And you've invaded the privacy of an individual motorist who is innocent. Maybe the police department doesn't care about that, but it certainly cares about wasting the time of its police officers in fruitless searches. The incentive of the officer to be able to conduct a search when he doesn't otherwise have probable cause is a powerful incentive. As the Court has said, ferreting out crime is a competitive enterprise. And also, these Scalia Willy-nilly. Officers just like to search. They don't particularly want to search where they're likely to find something. They just like to search. So let's get dogs that, you know, smell drugs when there are no drugs. You really think that's what's going on here? Officers like to search so that they can get probable cause, so that they can advance their career. Forfeiture is also an issue in this case. Scalia They like to search where they're likely to find something. And that only exists when the dog is well trained. It seems to me they have every incentive to train the dog well. But the question goes back to the dog's reliability, what the officer knows objectively, and what that officer can demonstrate on the stand to the trial court to determine by the totality of the circumstances that that dog is well trained. Roberts I'm confused about the difference between must and is required. What if the judge has before him or her a record, this is where the dog went to school and it's bona fide at school, this is where the dog was certified, he's trained every, you know, couple of weeks or whatever it is, and the judge says, do you have any field records, and the officer says no, and the judge says, well, then no probable cause. That's reversible error, right? Forfeiture It is reversible error if we know what went into the training and certification. Was that training and certification sufficient to prove the dog was reliable? Did it include the use of blanks? And did the lawyer Roberts And you have, I guess, experts testify about whether what constitutes a good training program. Forfeiture No, not necessarily experts, but simply the officer who participated with the dog can testify as to what he and the dog went through to obtain the training certificate and the certification. Scalia I assure you that if we agree with you, there will be a whole body of experts that will spring into being about dog training. I assure you that that will be the case. Forfeiture Those experts already exist. They are prevalent in the case law already. Sotomayor Sotomayor I understood the Florida Supreme Court counselor to say that the deficit in the training records here was because there was no evidence of false positives, that the reports didn't say, the training reports didn't say if the dog was alerting falsely. Assume that the record, as your adversary claims, shows the opposite, that a satisfactory completion means that the dog detected drugs where they were. What — why wouldn't the training records here be adequate in that circumstance? That would be one of several showings that would make the training records adequate. Also, you would want to know whether there were distractors used in the field. However, I don't believe that the record supports, except, and this is arguable, the parties dispute this for the maintenance training. All the State had for the initial training with Deputy Morris, not with Deputy Ridley, was a certificate. One certificate that said this dog was trained by the Apopka Police Department for 120 hours with Deputy Morris. Another certificate saying that this dog was certified by drug beat narcotics certifications, again with Deputy Morris, for one year. Sotomayor, I guess what I'm asking you is, as a matter of law, you want us to hold that training records are inadequate unless what? Unless you're going to specify now a list of things they have to include? Now, this Court in a number of circumstances has provided examples that can guide a court in probable cause determinations. In Illinois v. Gates, under the old Aguilar-Spinelli test, the Court has specified where evidence on one prong can be so strong that it substitutes for evidence on another prong. In Ornelas, the Court pointed to local knowledge that can be relied upon, such as the winter climate in Milwaukee. Scalia. But, counsel, you're defending a Florida Supreme Court opinion which says must. You can't just say, you know, I'm not asserting any particular thing is necessary, just, you know, totality of the certain. You have an opinion here in which the Florida Supreme Court says must. It must include the, you know, the field training. Now, do you disavow that or do you want us to ignore it? What? That is not the holding on which I'm relying here. The holding on which I'm relying is that training and certification alone, the mere fact of training and certification alone is not sufficient to establish the dog's reliability. And as to the language about must, remember, the Florida Supreme Court didn't just say that the failure to produce one of these elements necessitated reversal. It then went and engaged in a totality of the circumstances test. And several lower courts applying that case, applying Harris, have reached the same conclusion. In two of those cases, if the case is absent in the totality of the circumstances and you nonetheless hold that there was probable cause, then must does not mean must. Right? Must means must if the State has the records. If the records exist, then the State must establish. Ginsburg, the Florida Supreme Court said it listed, along with training, the provision of records of field performance. I read that as if those records exist, the State must produce them, because not only does it bear the burden of proof, it's the only party that can produce these records, because it includes the dog. Suppose it's a dog that's just completed the training course, top-performing dog in the training program, but there's no field record. If that – if the training is sufficient, if it has those elements that demonstrate that the dog is reliable, those are the circumstances. You have the totality of the circumstances there, and those circumstances don't include any field performance. And, yes, under that circumstance, a trial court can find the dog to be reliable. Alito, what is wrong with the State's argument that field performance records are not very probative because dogs detect odors, they don't detect the physical presence of the substance that created the odor, and therefore so-called false alerts, cases in which a search was performed and no contraband was found, are not really cases of false alerts. What's wrong with that? Well, you don't know whether they're cases of false alerts or not, because the State will always point to the possibility of residual odor as a reason. And we know from the studies that have been cited in the briefs that there are other reasons that dogs alert when that alert cannot be verified. Handler cueing is identified as the chief one. And simply, dogs make mistakes. Dogs err. Dogs get excited and will alert to things like tennis balls in trunks or animals. That's the thing. Alito, that may all be true, but then what can one infer from the fact that a dog alerted a number of times when no contraband was found? I think what you just said was the explanation could be the dog detected an odor, but the substance wasn't there. Or it could be that the dog was cued or the dog was confused or the dog is not very competent. So what can one infer from these field performance records? Well, what you can infer is this dog is not a very accurate indicator of probable cause, because probable cause tests whether drugs are likely to be found in a search that follows an alert. If the dog's high But they are likely to be found if there is a residual odor of drugs, even though the drugs are no longer there. So it's not an incompetent dog when he alerts because of the residual odor. But if a dog has previously alerted and no drugs have been found because the dog's hyperacuity causes him to smell drugs that were there 2 days or 2 weeks ago, then the next time that dog alerts, it's less likely, the probability declines, that drugs will be found. It goes to what probable cause measures rather than what the dog training and certification community measure, and that is the likelihood, the reasonable probability, that drugs will be found following the search. Sotomayor, how is that any different than a police officer who comes to a car and smells marijuana? He's never going to know whether there's any more in the car or not. It could have been smoked up an hour before. I don't know how long marijuana lingers for, but I'm not sure why residual odor affects the reliability of the dog, which was Justice Scalia's point. It's no different than an officer who smells something. He doesn't actually know whether it's physically still present or not, but we're talking about probabilities. That's correct. And the difference is that the police officer can describe what he has smelled and can say, I smelled marijuana. All the dog tells the police officer is, I smelled something I was trained to detect, perhaps, if I'm operating correctly. But getting to this issue of residual odor, our position is that an alert where no drugs are found means that the dog, that it detracts from probable cause in that instance. But that's not the only rule available to the Court. Residual odor, whether an alert was to residual odor and is therefore correct and accurate, is something that can be litigated. In one of the lower courts that decided the case after the Florida Supreme Court, the Court looked at the field performance records, and it found several of them well-supported on the issue of whether the alert was probably to the odor of drugs, several it didn't find. So that is an issue that can be litigated. Another possibility is a ---- Alitos, when nothing is found, how can you tell whether the dog alerted to a residual odor or simply made a mistake? Now, there may be cases where there's other evidence that suggests that drugs were present in that location, and therefore, that is something from which you could infer that the dog was alerting to residual odor. But the fact that you don't have evidence of that doesn't mean that there wasn't residual odor. No, it doesn't mean that there wasn't residual odor. But again, you go back to what probable cause measures, I believe. And the Florida Supreme Court didn't demand evidence of residual odor. What it did is it said that if field performance records exist, then the State can explain unverified alerts in the field as residual odor, and then a court can then evaluate that. What's the magic number? What percentage of accurate alerts or inaccurate is enough for probable cause? This Court has always hesitated to assign percentages to probable cause, but in the case of 50 percent, probable cause is much less likely to be found, assuming that there's no other corroborative evidence, no other reasonable suspicion factors. I'd like to talk briefly about the Oregon Supreme Court and what that Court did in several cases. Helzer and Foster decided in 2011, independently of the Florida Supreme Court decision, doesn't have to cite Harris. In Foster, the Oregon Supreme Court had a dog that trained initially with the same handler, unlike here, where the evidence was very strong as to the features of the training and certification program, and where that dog had, I believe, a 66 percent field performance record. Now, the Court in Foster said that the dog's reliability can be established by training, certification, and performance in the field. The Court added that it didn't think that performance in the field was the most reliable measure, but it's relevant, and the Court considered that 66 percent percentage. But then, on the same day in Helzer, there was a dog that trained initially with a different handler, that the handler ultimately testified to very few details of the ongoing training and the certification. In Foster, the certification was with an organization that required a 90 percent success rate. In Helzer, there was no such testimony. And this officer, like the officer here, didn't keep field performance records when the dog alerted and no drugs were found. In Helzer, the Court found that there was insufficient evidence of reliability, and I believe that those two cases demonstrate what is a — what is a correct line to draw in navigating what is reliable. On several arguments made by the State, the argument was that the maintenance training included blanks and that the dog did not alert to blanks. The record, we believe, supports the Florida Supreme Court's conclusion that blanks were tested, the dog was tested on blanks, but there was no testimony as to whether the dog didn't alert on those blanks. The State has said that the dog was subsequently recertified. I don't find support in the record for that. At the suppression hearing, the State argued that the officer testified that the dog was scheduled for another certification, but we don't know whether the dog was ever recertified. The Court can affirm the Florida Supreme Court simply on the failure to produce adequate documentation of certification and initial training, and on the fact that this dog was never certified with this trainer, with this handler, and didn't initially work with this handler. You don't have a dog here who was reliable enough to demonstrate probable cause. The Florida Supreme Court so concluded, I believe its conclusion was correct, and unless there are additional questions. Ginsburg. The alert here could have been to residual odor, or it could have been to drugs inside the pickup truck. If it's as the alert was in front of the front door handle, so it's equally likely that it was just residual odor, or that there were drugs inside the pickup truck. Can the police establish probable cause when what the dog alerted to may well have been residual odor and nothing inside? Because the dog didn't alert any place other than the door handle, is that? It can constitute probable cause. What Officer Wheatley testified to in this case was he believed that this alert was to residual odor on the door handle. Excuse me. Did you say it can or it can't? It may. It may. It can constitute probable cause in this case. Officer Wheatley testified that this dog alerted to the door handle. And in his prior experience, when the dog alerts to the door handle, it means that someone who had smoked or consumed drugs or handled drugs had touched the door handle. Now, if Officer Wheatley had testified that in his experience, when he'd seen such alerts and conducted a search, drugs were found inside the vehicle, then that residual odor alert would support probable cause. Officer Wheatley did not so testify. There was insufficient evidence that this residual odor alert, that a residual odor alert of this nature without finding drugs afterward supports probable cause. But at least we don't have to worry about mothballs in this case. Is that right? There are no mothballs. No mothballs to my knowledge, no, Your Honor.  Sotomayor, did you say that this dog alerted to the wrong part of the truck? No, Your Honor. Was it any part of their reasoning? They were concerned about residual odor alerting without any explanation by the State as to how residual odor alerting supports probable cause. But the primary basis for its decision was the lack of performance records and the lack of records supporting initial training and certification to show that this dog was reliable. And if we think they were wrong in that respect, I suppose you would say the Court shouldn't reverse but should vacate and remand, because the question, did alerting to the door handle, was that enough, was that enough to establish probable cause that there were drugs in the vehicle? Well, I don't think the door handle itself is dispositive. I think it's the door handle plus the lack of evidence that we have a reliable dog. And again, the reason you need a reliable dog, evidence on what training and certification means, is that there are no standards, no standards whatsoever for initial training. Some States do have standards for training and certification. Florida does not. And no standards for maintenance training as well. In order to have probable cause, you have to know what that certification, what that training means, if you don't have standards that will tell that for you. If there are no additional questions, I'll conclude. Roberts. Thank you, counsel. Mr. Garre, you have three minutes. Thank you, Your Honor. First, probable cause under this Court's precedence looks not only to the likelihood that contraband would be present, but the likelihood that there would be evidence of a crime. And that would include the so-called residual odor, evidence that drug paraphernalia, someone had recently smoked illegal narcotics in the vehicle, or the like. So the alert to the so-called residual odor of drugs is just as probative to the question of probable cause as an alert to drugs themselves. The fact that Aldo alerted to the door handle area of the car doesn't negate in any way the probable cause that Officer Wheatley had to search. What it means is that the door handle area was where the scent of the illegal narcotics was the strongest. It could have been narcotics coming out of that area or coming out of the door seam, or it could have been the fact that someone who had used narcotics was using the door handle to get in and out of the car. Second, courts can determine reliability in this context. They would look to the performance in the controlled training environment. There is a real danger with suggesting that field performance records are a permissible  because, one, as Justice Alito pointed out, it's not a controlled scenting. We don't know whether the dog did alert to residual odors of narcotics that had been in the car, drugs that were hidden and simply not found during the relatively ---- Scalia. Would you allow counsel to ask about that? I think they could ask about it, Your Honor. I don't think they could demand the performance records themselves. And that would be a huge deterrent to law enforcement even maintaining those records. Third, Officer Wheatley and Aldo did train together for nearly a year before the search in question. They did complete the 40-hour drug detection seminar at the Dothan, Alabama Police Department, and that certificate's at page 105 of the record. And second, as Justice Scalia pointed out, all the incentives in this area are aligned with ensuring the reliability of drug detection dogs. It's not in the police interest to have a dog that is inaccurate in finding contraband or that is inaccurate in putting an officer in harm's way. Humans have relied upon dogs for law enforcement-related purposes due to their extraordinary sense of smell. For centuries, dog-trained drug detection dogs and explosive detection dogs are invaluable members of the law enforcement community today. We would ask the Court to reverse the decision below, which would act as a serious detriment to the use of that valuable tool. Thank you, counsel. The case is submitted.